UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SHEILA L. TABB,

    Plaintiff,

*v*.                                       CASE NO. 07-CV-14193

COMMISSIONER OF          DISTRICT JUDGE PAUL D. BORMAN
SOCIAL SECURITY,           MAGISTRATE JUDGE CHARLES E. BINDER

    Defendant.
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**[1]

**I.    RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

## II. REPORT

### A. Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability and disability insurance benefits. This matter is currently before the Court on cross-motions for summary judgment. (Dkt. 11, 16.)

Plaintiff was 42 years of age at the time of the most recent administrative hearing. (Dkt. 5, Transcript at 12, 35.) Plaintiff's relevant employment history includes work as a receptionist for a law firm, a switch board operator for two years, an assembler/order packer for 4 years, a dispatch clerk for one year, and an assembly line worker for three years. (Tr. at 51, 411, 420.)

Plaintiff filed the instant claim on April 22, 2004, alleging that he became unable to work on April 30, 2002. (Tr. at 42.) The claim was denied initially and upon reconsideration. (Tr. at 19.) In denying Plaintiff's claims, the Defendant Commissioner considered "disorders of back, discoogenic and degenerative" as possible bases of disability. (*Id.*)

On October 18, 2006, Plaintiff appeared with counsel via video at a hearing before Administrative Law Judge ("ALJ") Bernard A. Trembly, who considered the case *de novo*. In a decision dated November 6, 2006, the ALJ found that Plaintiff was not disabled. (Tr. at 9-18.) Plaintiff requested a review of this decision on December 4, 2006. (Tr. at 8.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on September 24, 2007, when the Appeals Council denied Plaintiff's request for review. (Tr. at 5-7.) On October 2, 2007, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B. Standard of Review

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with

observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence.")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, the court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). The scope of the court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record,

regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("'[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *accord Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

**C.     Governing Law**

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also* 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If Plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *Heston,* 245 F.3d at 534. " If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin v. Comm'r*, 475 F.3d 727, 730 (6th Cir. 2007).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v), (g).

### D. Administrative Record

A review of the medical evidence contained in the administrative record and presented to the ALJ indicates that Plaintiff was treated by Seema Kumar, M.D., a psychiatrist, from 2001-2003. (Tr. at 92-105.) Dr. Kumar prescribed anti-depressants for Plaintiff. (Tr. at 92-93.)

Plaintiff was also treated by Lisa Grant, M.D., between 2001 and 2002 for back and neck pain. (Tr. at 107-25.) Plaintiff first sought treatment in June 2001 for "severe whiplash injury secondary to her motor vehicle accident." (Tr. at 122.)

Plaintiff underwent a CT scan of the lumbar spine in July of 2001 which showed "[m]inimal disc bulge at L3-4, L4-5, and L5-S1 without spinal stenosis[,] [m]ild narrowing of the inferior

aspect of the right neural foramen at L4-5 without nerve root compression[,] [and] [n]o fracture in the lumbar spine." (Tr. at 140.) In August 2001, Dr. Grant referred Plaintiff for an MRI of the lumbrosacral spine. (Tr. at 125.) The MRI revealed "[a]t L4-L5 in addition to the mild predominantly degenerative central and right lateral recess narrowing, there is a right paramedian disc herniation leading to further effacement upon the ventral aspect of the thecal sac and right L5 nerve root sleeve within its lateral recess." (Tr. at 125.)

Plaintiff was also seen by Eeric Truumees, M.D., in December 2001, who assessed Plaintiff's condition as "lumbar radiculopathy." Dr. Truumees performed a right L4-L5 hemilaminectomy in August 2001 and recommended physical therapy. (Tr. at 147, 152, 155, 162, 164-65.) After surgery, an MRI showed "scar tissue at L4/L5 on the right" but "no disc herniation" and "L5/SI and L3/L4 remain normal." (Tr. at 157.)

Although Dr. Tuumees noted that Plaintiff was doing well after surgery, she continued to complain of pain. (Tr. at 148, 152.) Plaintiff underwent some physical therapy pursuant to Dr. Grant and Dr. Truumees' recommendations. (Tr. at 112, 116, 118.) Plaintiff also received lumbar "epidural injection[s]" for pain in November 2001. (Tr. at 170-75.) Although Plaintiff "had a lot of improvements after therapy" her pain appeared to be worsening, so Dr. Grant ordered another MRI in August 2002, which revealed "[c]entral compressive disc herniation at C5/C6 with no abnormal cord signal change" and "epidural scar tissue at the operative site at L4/L5" and "some low signal change in the far lateral portion of the right epidural space at L4/L5 most likely representing a disc herniated fragment." (Tr. at 124.)

In June 2002, Dr. Grant referred Plaintiff to the Beaumont Pain Clinic for an evaluation after which Dr. Marc Ian Wittenberg concluded that Plaintiff had "[l]ow back pain consistent with severe facet dysfunction." (Tr. at 138.) As per Dr. Wittenberg's recommendation, Plaintiff

7

underwent "bilateral lumbar medial branch blocks, L4, L5 and sacral ala" and a "median branch nerve block L4 through the sacral ala bilaterally" in July of 2002. (Tr. at 133-36.) Chest x-rays taken in August of 2002 revealed "[n]o acute intrathoracic disease." (Tr. at 139.)

Dr. Grant referred Plaintiff to Dr. R.E. Olson, M.D., who examined Plaintiff on August 28, 2002, and who noted that [h]er neurological exam was really unremarkable other than she has a lot of back and neck stiffness and soreness." (Tr. at 181.) After he "reviewed her MRI scan, [he stated that] it appears that she may have a large disc herniation at the C5-6 level centrally; however, on the sagittal images, I don't see much in the way of herniation on these images." (Tr. at 181.)

Dr. Grant also referred Plaintiff to Dr. Mark H. Falahee, M.D., F.A.C.S., who examined Plaintiff and concluded that her "[n]eck and back pain [were] most likely musculoskeletal in origin" and thus, recommended physical therapy. (Tr. at 183.)

In October 2002, a psychiatric review was performed which concluded that Plaintiff has the medically-determinable impairment of "panic disorder without agoraphobia." (Tr. at 186.) Plaintiff was assessed as moderately limited in her ability to perform daily activities, maintain social functioning, and maintain concentration, persistence or pace. (Tr. at 187.) In addition, a mental Residual Functional Capacity ("RFC") assessment indicated that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, her ability to maintain attention and concentration for extended periods and her ability to sustain an ordinary routine without special supervision. (Tr. at 190.) Plaintiff was assessed as not significantly limited in her ability to remember locations and work-like procedures, the ability to understand and remember very short and simple instructions, the ability to carry out very short and simple instructions, the ability to carry out detailed instructions, the ability to perform activities within a schedule,

maintain regular attendance and be punctual within customary tolerances, and the ability to work in coordination with or proximity to others without being distracted by them. (Tr. at 190.)

Plaintiff was also assessed as being moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, her ability to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to interact appropriately with the general public, the ability to respond appropriately to changes in the work setting, and the ability to set realistic goals or make plans independently of others. (Tr. at 191.) She was not assessed as limited in any other areas of sustained concentration and persistence, social interaction or adaptation. (*Id.*) The physical RFC assessment concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk (with normal breaks) about 4 hours in an 8-hour workday, sit (with normal breaks) for about 6 hours in an 8-hour workday, and is unlimited in her ability to push and/or pull including operation of hand and/or foot controls. (Tr. at 195.) Plaintiff was assessed as being frequently limited in her ability to balance, kneel, and crawl, and occasionally limited in her ability to stoop and crouch. (Tr. at 196.) There were no manipulative, visual, communicative, or environmental limitations noted. (Tr. at 197-98.)

Plaintiff was admitted to the hospital for treatment of possible viral meningitis in March 2003. (Tr. at 202-11.) On March 25, 2003, an echocardiogram showed "[m]ild left atrial enlargement, normal left ventricular systolic and diastolic function. There was no significant valvular abnormalities. There is a mild degree of mitral regurgitation and trivial tricuspid and pulmonic regurgitation." (Tr. at 212.) In July 2003, an x-ray of the chest was normal. (Tr. at 248.) The following month, an x-ray of the soft tissue of the neck was normal. (Tr. at 247.)

In September 2003, Plaintiff was admitted to the hospital with atrial fibrillation. (Tr. at 272-87.) Under Dr. Ghai's care, she was given Lanoxin and Heparin, and was released the next day in stable condition. (Tr. at 272.)

In December 2003, Plaintiff went to the hospital complaining of chest pain but was discharged with a diagnosis of "[a]typical chest pain." (Tr. at 296.) Dr. Ghai noted that Plaintiff was still having "breakthrough atrial fibrillation," so he ordered an echocardiogram after which he concluded that Plaintiff experienced "[m]ild mitral regurgiation [and] [t]race tricuspid regurgitation." (Tr. at 291-96.) A CT pulmonary angiogram performed in December 2003 was normal. (Tr. at 245.)

Later that month, Plaintiff again sought treatment with Dr. Ghai for chest pain and discomfort. Dr. Ghai prescribed nitroglycerin and scheduled a stress test, but since Plaintiff continued to have chest pain, she was admitted to the hospital that evening. (Tr. at 229.) Plaintiff underwent a "venous duplex scan of the bilateral lower extremities" which showed that "all veins were compressible. They were not distended, color flow showed good augmentation with distal compression. They were phasic with respiration. There was no echogenicity inside lumen of the vein. There was no evidence of acute deep vein thrombosis of bilateral lower extremities." (Tr. at 227.)

In January 2004, Plaintiff underwent a "coronary angio, Lt Ht with LVgram." (Tr. at 298.) The diagnostic summary of this test stated that Plaintiff had "normal coronary arteries." (Tr. at 304.) Around this same time, Dr. Ghai referred Plaintiff to Dr. Mark F. O'Connor, M.D., of the Toledo Cardiology Consultants, Inc. (Tr. at 310-12.) Dr. O'Connor found Plaintiff was "doing very well with good suppression of paroxysmal atrial fibrillation on a regimen of Tambocor, Diproxin and Toprol. She is experiencing occasional, very brief periods of breakthrough of [sic]

10

atrial fibrillation, and these are mostly nocturnal so we will increase her 8:00 p.m. dose from 100 mg to 150 mg of Tambocor." (Tr. at 310.)

In April of 2004, Plaintiff again sought treatment at the hospital and Laura Burlen, M.D., gave her nitorgen-oxygen therapy and released Plaintiff two days later. (Tr. at 321, 326-28.) Dr. Ghai also saw Plaintiff at this time, noted that she has "[p]aroxysmal atrial fibrillation" and "[m]inimal coronary artery disease" but concluded that her "condition is stable." (Tr. at 324-25.)

In May of 2004, a chest x-ray showed "no active disease." (Tr. at 243.) In April of 2004, Dr. Ghai's echocardiology report showed "[m]oderate Mitral regurgitation [and] [m]oderate Tricuspid regurgitation with pulmonary hypertension." (Tr. at 289.)

In September of 2004, a physical RFC concluded that Plaintiff could life 20 pounds occasionally, 10 pounds frequently, stand and/or walk (with normal breaks) for 6 hours in an 8-hour workday, sit (with normal breaks) for about 6 hours in an 8-hour workday, and that Plaintiff was unlimited in her ability to push and/or pull. (Tr. at 357.) The assessment further concluded that Plaintiff was occasionally limited in the postural area, including climbing, balancing, stooping, kneeling, crouching and crawling. (Tr. at 358.) There were no manipulative, visual, communicative, or environmental limitations noted, other than exposure to fumes, odors, dusts, and gases. (Tr. at 359-60.)

A mental RFC assessment indicated that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods and her ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances. (Tr. at 364.) Plaintiff was assessed as not significantly limited in her ability to remember locations and work-like procedures, the ability to understand and remember very short and simple instructions, the ability to understand and remember detailed instruction, the ability to carry out very short and

simple instructions, the ability to carry out detailed instructions, the ability to sustain an ordinary routine without special supervision, the ability to work in coordination with or proximity to others without being distracted by them, and her ability to make simple work-related decisions. (Tr. at 364.)

Plaintiff was also assessed as being moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and the ability to set realistic goals or make plans independently of others. (Tr. at 365.) Plaintiff was not found to be limited in the ability to interact appropriately with the general public, the ability to ask simple questions or request assistance, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, the ability to respond appropriately to changes in the work setting, the ability to be aware of normal hazards and take appropriate precautions, and the ability to travel in unfamiliar places or use public transportation. (Tr. at 365.)

A psychiatric review conducted at that same time found Plaintiff mildly limited by restriction of activities of daily living and difficulties in maintaining social functioning, and moderately limited by difficulties in maintaining concentration, persistence, or pace. (Tr. at 369.) There were no other limitations noted and there were no "C" criteria established. (Tr. at 369-70.) The review, however, concluded that Plaintiff has a medically-determinable impairment that does not precisely satisfy the diagnostic criteria. (Tr. at 368.)

Plaintiff was treated at the Arrhythmia Clinic under the supervision of Frank Bogun, M.D., from July 2004 through August 2005, where she underwent several ablation procedures. (Tr. at

375-402.) In August 2005, Dr. Bogun performed a catheterization procedure which "attempted to induce atrial fibrillation" which "was occasionally inducible with the longest duration of 10 to 15 milliseconds. We could not induce a sustained atrial fibrillation." (Tr. at 375.) Thus, he recommended she continue on beta-blocker and calcium-channel-blocker therapy but be taken off of her anti-arrhythmic medication. (Tr. at 375.)

### E. ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since April 30, 2002, and that Plaintiff meets the insured status requirements through December 31, 2006. (Tr. at 14.) At step two, the ALJ found that Plaintiff's atrial fibrillation, degenerative disc disease of the lumbar spine and status post-laminectomy, degenerative disc disease of the cervical spine, and major depressive disorder were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 15.) At step four, the ALJ found that Plaintiff could perform her previous work as a telephone operator. (Tr. at 17.) The vocational expert ("VE") testified that there were jobs available as a telephone operator, store laborer, general clerk and electronic assembler that are classified in the same way as her past relevant work. (*Id.*) Therefore, the ALJ found Plaintiff was not disabled as defined in the Social Security Act from April 30, 2002, through the date of the decision. (Tr. at 18.)

### F. Analysis and Conclusions

#### 1. Legal Standards

The ALJ determined that Plaintiff possessed the residual functional capacity to return to sedentary exertional work with the following mental limits: can understand, remember and carry

13

out detailed but uncomplicated instructions; can maintain concentration and attention for simple repetitive work; can relate and interact with the public, supervisors and coworkers; and can tolerate low to moderate level stress work. (Tr. at 15.) The ALJ also indicated that he specifically asked the vocational expert ("VE") whether there were any disagreements with the provisions of the Dictionary of Occupational Titles ("DOT") and the VE responded that there were none. (Tr. at 17.)

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). Social Security Ruling 83-10 clarifies this definition, explaining that:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

S.S.R. 83-10, 1983 WL 31251, at *5 (1982).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether or not substantial evidence supports the ALJ's decision.

### 2. Substantial Evidence

Plaintiff argues that substantial evidence fails to support the findings of the Commissioner. As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *See McClanahan,* 474 F.3d at 833; *Mullen,*

800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff contends that the ALJ did not properly analyze the credibility of Plaintiff's subjective complaints of pain. (Dkt. 11 at 16-18.) Under the test set forth in *Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), "[f]irst the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment . . . that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id*. at 853. If there is, Plaintiff is not required to establish objective evidence of the pain itself but the court will examine: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Felisky,* 35 F.3d at 1038-39. The Regulations provide the following guidelines in evaluating whether the medically-determinable impairment could reasonably be expected to produce a plaintiff's alleged symptoms such as pain:

> [T]he entire record of medical and nonmedical evidence will be considered in evaluating the intensity and persistence of those symptoms, including the following factors: (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

In the instant case, the ALJ expressly considered all of the above factors and considered Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms

to be "not entirely credible" in light of the objective medical evidence. (Tr. at 15-17.) Although Plaintiff's daily activities are not strenuous, she is able to do everything necessary to care for herself and does not require any assistance getting around. (Tr. at 64-68.) There is no medical evidence indicating an inability to perform sedentary work.

On the contrary, the medical evidence establishes that although Plaintiff has atrial fibrillation, post-laminectomy spinal issues, and major depressive disorder, none of these conditions prevent sedentary work. After laminectomy surgery, Dr. Truumees found "scar tissue at L4/L5 on the right" but "no disc herniation" and "L5/SI and L3/L4 remain normal." (Tr. at 157.) The only lasting issue after surgery was "some low signal change in the far lateral portion of the right epidural space at L4/L5 most likely representing a disc herniated fragment." (Tr. at 124.) A neurological exam was unremarkable and Dr. Olson did "not see much in the way of herniation." (Tr. at 181.) Dr. Falahee concluded that her "[n]eck and back pain [were] most likely musculoskeletal in origin" rather than due to any spinal issues. (Tr. at 183.) Multiple chest and neck x-rays were normal. (Tr. at 139, 243, 247, 248.) Plaintiff's atrial fibrillation has been successfully managed such that Plaintiff is doing well and is in a stable condition according to her physicians, despite Plaintiff's rather frequent visits to the hospital. (Tr. at 227, 245, 272, 310, 324-25, 375.)

In accordance with *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987), the ALJ's findings also follow the opinions of the vocational expert which came in response to proper hypothetical questions that accurately portrayed Plaintiff's individual physical and mental impairments in harmony with the objective record medical evidence as presented by all the treating and examining physicians, as well as the daily activities described by Plaintiff herself, i.e., that she is able to cook 2-3 days a week, washes clothes once a week, goes outside ever day,

16

grocery shops for an hour at a time, reads every day and talks with her sisters and mother every other day. (Tr. at 64-68.)

"The rule that a hypothetical question must incorporate all of the claimant's physical and mental limitations does not divest the ALJ of his or her obligation to assess credibility and determine the facts." *Redfield v. Comm'r of Soc. Sec.*, 366 F. Supp. 2d 489, 497 (E.D. Mich. 2005). The ALJ is only required to incorporate the limitations that he finds credible. *Casey v. Sec'y of HHS,* 987 F. 2d 1230, 1235 (6th Cir. 1993). This obligation to assess credibility extends to the claimant's subjective complaints such that the ALJ "can present a hypothetical to the VE on the basis of his own assessment if he reasonably deems the claimant's testimony to be inaccurate." *Jones*, 336 F.3d at 476. As indicated above, I suggest that substantial evidence supports the ALJ's credibility determination and therefore, also find that substantial evidence supports the hypothetical provided to the VE.

Accordingly, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is well within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III. REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are

advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                            s/ Charles E Binder
                            CHARLES E. BINDER
Dated: August 21, 2008               United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on Janet Parker, Norton Cohen, and the Commissioner of Social Security, and served on U.S. District Judge Borman in the traditional manner.

Date:  August 21, 2008          By     s/Patricia T. Morris
                                             Law Clerk to Magistrate Judge Binder